IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

KINSHIP PARTNERS, INC.,                 No. 3:21-cv-01631-HZ

         Plaintiff,                          OPINION & ORDER

     v.

EMBARK VETERINARY, INC. and
ROBIN P. SMITH,

         Defendants.

Kjersten H. Turpen
K&L Gates LLP
One SW Columbia Street, Suite 1900
Portland, OR 97204

Jonathan Stoler
Adam Pekor
Lindsay C. Stone
Sheppard, Mullin, Richter &
Hampton LLP
30 Rockefeller Plaza
New York, NY 10112

     Attorneys for Plaintiff

1 – OPINION & ORDER

Peter Hawkes
Edward A. Piper
Angeli Law Group LLC
121 SW Morrison Street, Suite 400
Portland, OR 97204

Jeffrey M. Edelson
Markowitz Herbold PC
1455 SW Broadway, Suite 1900
Portland, OR 97201

      Attorneys for Defendants

HERNÁNDEZ, District Judge:

Plaintiff Kinship Partners, Inc. ("Kinship") seeks an injunction that prohibits Defendants Robin P. Smith ("Smith") and Embark Veterinary, Inc. ("Embark") "from possessing, using, disclosing, or benefitting from . . . Kinship's trade secrets and confidential and proprietary information in any manner." Pl. Mot. 1, ECF 2. Plaintiff also seeks to enjoin Smith from working for Embark for a period of 12 months. *Id.* Smith, who previously worked at Kinship, resigned from his position on November 1, 2021 and had intended to begin employment with Embark on November 15, 2021. Ex. 2; Smith Decl. ¶ 16. The Court issued a Temporary Restraining Order ("TRO") on November 10, 2021 and held an evidentiary hearing on Plaintiff's Motion for a Preliminary Injunction on November 22, 2021. For the reasons stated below, the Court denies Plaintiff's motion and dissolves the TRO.

## BACKGROUND

Kinship and Embark, as the two leading providers of canine DNA testing services worldwide, are head-to-head competitors. Compl. ¶ 2, ECF 1. Defendant Smith is the former Head of Product for Kinship's Wisdom brand, which offers customers pet DNA testing and related services. Ex. 6; Compl. ¶ 17. Smith was hired by Kinship on December 17, 2020 "to lead

all aspects of the product development, user experience, and visual design of Wisdom, as well as to devise and lead the brand's overall business strategy. Yoo Decl. ¶ 11, ECF 2-1. Smith had previously worked for Kinship's parent company, Mars Petcare, US ("Mars") beginning July 2019. Compl. ¶ 3. Smith was an "at-will" employee at Kinship, which means either Smith or Kinship could terminate the employment relationship at any time. Ex. 6, ¶ 7. Kinship requests, but does not require, that employees give two weeks' notice upon resignation. Ex. 24D.

On December 17, 2020, when he was hired to his recent position at Kinship, Smith signed a Proprietary Information and Inventions Agreement ("IP Agreement") and a Confidential Information and Invention Assignment Agreement. ("Confidentiality Agreement"). Yoo Decl. ¶ 15; Ex. 24C. Paragraph 5(a) of the IP Agreement and paragraph 2(a) of the Confidentiality Agreement contain identical language as follows:

> Confidential Information. (a) Protection of Information. I agree, at all times during the term of the [employment] Relationship and thereafter, to hold in strictest confidence, and not to use, except for the benefit of the Company to the extent necessary to perform my obligations to the Company under the Relationship, and not to disclose to any person, firm, corporation or other entity, without written authorization from the Company in each instance, any Confidential Information (as defined below) that I obtain, access or create during the term of the Relationship, whether or not during working hours, until such Confidential Information becomes publicly and widely known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved. I further agree not to make copies of such Confidential Information except as authorized by the Company.

Ex. 24C. Paragraph 4 of the Confidentiality Agreement states in part:

> I agree that, at the time of termination of the [employment] Relationship, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, laboratory notebooks, materials, flow charts, equipment, other documents or property, or

3 – OPINION & ORDER

> reproductions of any of the aforementioned items developed by me pursuant to the Relationship or otherwise belonging to the Company, its successors or assigns.

*Id.* Smith also signed and received a copy of Kinship's Associate Handbook, which notifies employees that they must "keep all such confidential and proprietary information in confidence." Ex. 24D. All Kinship employees sign an IP Agreement, a Confidentiality Agreement, and the Associate Handbook. Some high-level Kinship employees are also required to sign noncompetition agreements as a condition of employment. Smith was not asked and did not sign a noncompetition agreement when he was first hired by Mars in July 2019 or when was hired by Kinship in December 2020. Smith Decl. ¶ 5.

On October 1, 2021, Embark CEO Ryan Boyko sent Smith a message through LinkedIn, inviting him to discuss the possibility of employment at Embark. *Id.* at ¶ 1. Smith claims that he was initially not interested because he did not want to work for Kinship's competitor. *Id.* at ¶ 3. But Smith became interested in the opportunity when he learned that Embark planned to move in a different direction than Kinship. *Id*. Embark specifically wanted "to get more into research and potentially drug discovery." *Id.* On October 15, after a series of scheduling emails, Smith met with Boyko over video chat. *Id.* at ¶ 5. Over the next two weeks, Smith met with several other Embark representatives to discuss the possibility of employment. *Id.* Smith accepted an offer of employment with Embark on October 29 and signed a formal offer letter on October 31. *Id.* at ¶ 6; Ex. 2. Embark's onboarding document for Smith states: "you will focus on supporting and improving the Research & Development arm of Embark (internally called "Branch 2")[.] . . . your work will *not* be focused on our existing product's strategy, sales or NPS. Success in your role will be measured on the rate and value of new discovery[.]" Ex. 42.

In the months leading up to his resignation from Kinship, Smith continued his work as Head of Product for the Wisdom brand. In September 2021, Smith gave a presentation to

Kinship's most senior executives entitled "Wisdom 2022+ Product & Innovation" that described the strategic vision for the Wisdom brand. Compl. ¶40. On October 27, 2021, Smith again presented the Wisdom brand's product roadmap and strategic vision to Kinship's senior directors. *Id.* at 41.

On November 1, 2021, Smith, who was working remotely from home, sent a Letter of Resignation by email to three senior leaders at Kinship, indicating that his last day would be November 12, 2021, and that he intended to join Embark in a role focusing on "research and discovery." Yoo Decl. ¶58, 61; Ex. 19. In his resignation email, Smith stated:

> I also plan to cease business activity today until directed on how you'd like to proceed – please advise. The only company property in my possession is the laptop I've been using over the past few years. I'm happy to bring this into the office or mail as directed.

Ex. 19. Within two hours of the resignation email, Smith received a call from Luis Alvarado, Kinship's head of human relations, who told Smith that Kinship was "accelerating" his resignation to be effective immediately. Smith Decl. ¶ 9. Kinship did not conduct an exit interview with Smith. *Id.* at ¶10.

On the day of Smith's resignation, Kinship conducted a "forensic review of his network activity." Compl. ¶ 43; Yoo Decl. ¶ 68. The forensic review found that Smith downloaded 27 documents—such as google presentations, PDFs, and excel files—from Kinship's secure cloud-based computer drive ("Shared Drive") during the six-month period before his resignation. Ex. 21. The last download was on October 1, 2021. *Id.*

Kinship also created a log of all files held in Kinship's Shared Drive that Smith accessed between August 1, 2021 and November 1, 2021. Ex. 26. On the morning of November 1, 2021, before he sent his notice of resignation, Smith accessed and either reviewed or edited files stored on the Shared Drive seven times. Five times, he accessed a file called "Wisdom Panel Business

Meeting Notes," which is a "living document" on which Smith provided updates each week to senior leaders of the Wisdom brand. Ex. 26. Smith states that on the morning he resigned, he entered his weekly updates into the Wisdom Panel Business Meeting Notes document so that the information would not be lost. Smith Decl. ¶ 7.

On November 4, 2021, Kinship sent a courier to Smith's home to retrieve his company laptop computer. Kinship solicited an outside firm to conduct a forensic review of that device. Def. Ex. 22; Compl. ¶ 43. The forensic review of Smith's laptop computer was not completed at the time of the preliminary injunction hearing.

## STANDARDS

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction must show (1) that he or she is likely to succeed on the merits; (2) he or she is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of the equities tips in his or her favor; and (4) an injunction is in the public interest. *Id.* at 20.

In the Ninth Circuit, courts may apply an alternative "serious questions" test, which allows for a preliminary injunction when a plaintiff shows that "serious questions going to the merits" were raised and the balance of hardships tips sharply in plaintiff's favor, assuming the other two elements of the *Winter* test are met. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011). This formulation applies a sliding scale approach where a stronger showing of one element may offset a weaker showing in another element. *Id.* at 1131. Nevertheless, the party requesting a preliminary injunction must carry its burden of persuasion

by a "clear showing" of the four elements set forth above. *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012).

## DISCUSSION

Plaintiff brings claims and seeks a preliminary injunction against Defendants Smith and Embark under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, and the Oregon Uniform Trade Secrets Act ("OUTSA"), Or. Rev. Stat. § ("O.R.S.") 646.461 *et seq*. Under the DTSA, a court may grant injunctive relief "to prevent any actual or threatened misappropriation . . . on such terms as the court deems reasonable." 18 U.S.C. § 1836(b)(3)(A)(i). The OUTSA authorizes courts to temporarily, preliminarily, or permanently enjoin actions that result in actual or threatened misappropriation of proprietary trade secrets. O.R.S. 646.463(1).

Plaintiff claims that Defendants Smith and Embark have engaged in both actual and threatened misappropriation of Plaintiff's trade secrets. Compl. ¶¶ 73, 88. Plaintiff bases its claims on two theories: (1) Smith has actually misappropriated its trade secrets and (2) Defendants threaten misappropriation of Plaintiff's trade secrets because Smith "will inevitably use and disclose them in connection with his duties at Embark." Pl. Mot. 19-20.

Plaintiff notes that Smith had access to Kinship's confidential and proprietary trade secrets, accessed and downloaded documents containing confidential and proprietary information while employed at Kinship, and then abruptly resigned with the intent to work for Embark— Kinship's primary competitor. Plaintiff alleges that Smith's downloading of documents containing confidential information is "suspicious," and thus Plaintiff believes that "Smith has shared or intends to share the information contained in these documents with Embark in connection with his employment." *Id.* at 19. Plaintiff also claims that Smith will be unable to

fulfill his job responsibilities at Embark "without disclosing or using Kinship's trade secrets and confidential and proprietary information." Compl. ¶¶ 72, 87.

Plaintiff seeks a preliminary injunction that: "(1) prohibits Defendants from possessing, using, disclosing, or benefitting from, either directly or indirectly, Kinship's trade secrets and confidential and proprietary information; and (2) prohibits Smith from working for Embark for a period of at least 12 months from the date he resigned from Kinship." Pl. Mot. 1.

**I.     Likelihood of Success on the Merits**

   **A.     Actual Misappropriation**

To succeed on its claim that Defendants actually misappropriated Plaintiff's trade secrets, Plaintiff must show (1) the information was in fact a trade secret; (2) Plaintiff took reasonable measures to maintain the secrecy of information; and (3) Defendants' conduct constitutes misappropriation. *Univ. Acct. Serv., LLC v. Schulton*, No. 3:18-CV-1486-SI, 2019 WL 2425122, at *5 (D. Or. June 10, 2019). The OUTSA provides a broad definition of "trade secret," which includes any information such as "cost data, customer list, formula, pattern, compilation, program, device, method, technique or process" that derives actual or potential "independent economic value" from not being generally known to the public. O.R.S. 646.461(4). Under the DTSA, "the term 'trade secret' means all forms and types of financial, business, scientific, technical, economic, or engineering information." 18 U.S.C. § 1839(3). Plaintiff alleges the trade secrets in Smith's possession include all aspects of Wisdom's brands strategic plan to compete with Embark. Pl. Mot. 10. Defendants do not contest that the subject of Plaintiff's concern and allegations are trade secrets. The Court agrees.

The Court also finds that Plaintiff took reasonable measures to protect its trade secrets. Every Kinship employee, including Smith, signs an IP Agreement and a Confidentiality

8 – OPINION & ORDER

Agreement, which specifically prohibit employees from disclosing confidential or proprietary information to anyone outside the company. Kinship employees use a secure shared cloud-based computer drive to maintain company work product. The Confidentiality Agreement and the Associate Handbook specify that upon termination of employment, each employee must return all company equipment and all documents containing proprietary information. These measures demonstrate that Plaintiff intended and took steps to keep confidential certain documents and information about its competitive strategy against Embark to which Smith had access.

Next, Plaintiff must provide evidence that Smith misappropriated Plaintiff's trade secrets. Both the DTSA and the OUTSA define "misappropriation" as the acquisition of a trade secret "by a person who knows or has reason to know that the trade secret was acquired by improper means" or the "disclosure or use of a trade secret of another without express or implied consent[.]" 18 U.S.C. § 1839(5)(A)-(B); O.R.S. 646.461(2). "Improper means" includes theft, bribery, misrepresentation, and breach of a duty to maintain secrecy. 18 U.S.C. § 1839(6)(A); O.R.S. 646.461(1). A plaintiff bears the burden of proving misappropriation and, at minimum, must show the defendant acted with some degree of bad faith. *Ferring B.V. v. Allergan, Inc.*, 4 F. Supp. 3d 612, 628 (S.D.N.Y. 2014). The plaintiff must "specifically connect allegations of misappropriation to specific [d]efendants' actions." *Physician's Surrogacy, Inc. v. German*, No. 17cv718-MMA (WVG), 2018 WL 638229, at *8 (S.D. Cal. Jan. 31, 2018).

      i.    *Downloaded Documents*

Plaintiff alleges that "in the weeks leading up to his resignation, [Smith] surreptitiously downloaded nearly 30 confidential business documents, including presentation materials outlining Wisdom's product roadmap for the next five years from the Company's Shared Drive." Yoo Decl. ¶ 68. Kinship's forensic review shows that Smith downloaded 27 documents over a

six-month period. The documents include "an analysis of the competitive pressures Kinship is facing from Embark" and "Kinship's internal product development timeline to beat Embark to the market." Pl. Mot. 19. Plaintiff alleges that Smith's downloads are "suspicious" and that Smith intends to share the information contained in those documents with Embark because "there is no other reason for Smith to have downloaded this information on the eve of his resignation." *Id.*

Plaintiff is correct that an employee who, without authorization, procures their employer's trade secrets and confidential information immediately before terminating employment may have engaged in misappropriation. *See A Place for Mom v. Perkins*, 475 F. Supp. 3d 1217, 1227 (W.D. Wash. 2020) (holding that the defendant employee misappropriated the plaintiff employer's protectible trade secrets when she emailed documents and reports to herself prior to resigning). But Plaintiff presents no evidence that Smith acted in bad faith, engaged in nefarious activity, or used improper means to acquire its trade secrets.

First, Kinship does not have a stated company policy against downloading documents from the company's shared drives. In fact, both Yoo and Timothy Hirsch, Kinship's head of legal compliance, testified that they occasionally download company documents to their personal devices. Although Plaintiff claims the frequency with which Smith downloaded documents is suspicious, it does not specify how many downloads by an employee over a given period of time is considered unusual. Plaintiff also provides no evidence that Smith tried to hide the fact that he downloaded documents from the Shared Drive. No one at Kinship told Smith not to download documents, and he was never reprimanded for doing so while he was employed at Kinship.

Second, Plaintiff cannot show that Smith's downloading of documents lacked a business purpose. *See CleanFish, LLC v. Sims,* No. 19-cv-03663-HSG, 2020 WL 1274991, at *10 (N.D.

10 – OPINION & ORDER

Cal. Mar. 17, 2020) (holding that, to state a claim for misappropriation, a plaintiff must allege facts that "tend to exclude an innocent explanation") (internal quotation and citation omitted). Plaintiff presents no evidence that Smith downloaded files for reasons other than for the performance of his job. Despite Plaintiff's claim that Smith downloaded confidential documents "in the weeks leading up to his resignation," Smith did not download any documents after he started discussing employment with Embark. Smith last downloaded a document from Kinship's Shared Drive on October 1, 2021—one month before he resigned.[1] The Court finds no indication that Smith's downloads were anything but innocuous.

Third, Plaintiff provides no evidence that Smith retained the documents he downloaded. In fact, Plaintiff concedes that it has no first-hand knowledge of Smith retaining any of Kinship's confidential documents. Yoo Dep. 160:2-5; 170:5-22. Nor can Plaintiff show that Smith has shared information contained in the documents he downloaded with Embark employees or anyone else outside of Kinship. Thus, Plaintiff fails to provide factual support for its allegation that Smith's downloaded documents from Kinship's Share Drive for nefarious reasons.

      ii.    *Files Accessed*

Plaintiff alleges Smith misappropriated its trade secrets by logging onto Kinship's Shared Drive and reviewing several confidential documents "as recently as an hour before he tendered his resignation." Compl. ¶ 45. But Plaintiff admits that it does not know why Smith accessed the files. Plaintiff cannot show that Smith accessed the files for reasons other than to perform his job duties at Kinship. Smith states that all the files he accessed are ones he used on regular basis during the course of his employment. Smith "edited" the "Wisdom Panel Business Meeting

---

[1] Smith was first contacted by Embark on October 1, 2021 and did not respond to Embark's request until October 8, 2021.

11 – OPINION & ORDER

Notes" file less than an hour before his resignation. Ex. 26. But Smith explains that he updated the file because doing so was his ongoing job responsibility, and he wanted to make sure the information did not get lost.

In summary, Smith had legitimate, innocuous reasons to download and access confidential files while he was employed at Kinship. Because Plaintiff fails to show Smith's actions were improper, it is unlikely to succeed on the merits of its claim that Defendants actually misappropriated Kinship's trade secrets.

### B. Threatened Misappropriation: The Inevitable Disclosure Doctrine

Plaintiff claims that Smith's employment with Embark threatens the misappropriation of Kinship's trade secrets and its confidential and proprietary information. Plaintiff asserts that because of Smith's key role in developing Kinship's strategy to compete against Embark, his decision to "assume a nearly identical role at Embark will inevitably lead him to use and disclose Kinship's trade secrets[.]" Pl. Mot. 20. According to Plaintiff, even if Smith did not improperly access or obtain any confidential documents, he retains knowledge of Kinship's trade secrets in his head and cannot work for Embark without using or disclosing those secrets in the normal course of his employment.[2] In seeking relief without evidence of actual misappropriation, Plaintiff urges the Court to adopt and apply the doctrine of inevitable disclosure. *Id.*

The seminal case that recognized the inevitable disclosure doctrine as a viable theory for trade secret misappropriation is *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262 (7th Cir. 1995). The rationale underlying the inevitable disclosure doctrine is that a plaintiff may establish threatened

---

[2] "In effect, Smith helped write Wisdom's entire playbook, and he retains that playbook to this day. If he joins Embark or any other direct competitor, he will inevitably draw on Wisdom's 'plays' to give Embark an unfair competitive edge in a battle for market share in the highly competitive pet care marketplace." Yoo Decl. ¶ 57.

misappropriation simply by the fact that the "defendant's new employment will inevitably lead that defendant to rely on plaintiff's trade secrets." *Phoseon Tech., Inc. v. Heathcote*, No. 3:19-cv-2018-SI, 2019 WL 72497, at *8-9. In *PepsiCo*, the Seventh Circuit held that the inevitability that a former employee would rely on the plaintiff's trade secrets in his new job with plaintiff's direct competitor demonstrated a likelihood of success on plaintiff's trade secret misappropriation claim under the Illinois Trade Secrets Act ("ITSA"). 54 F.3d at 1271. In other words, a former employee threatens misappropriation of trade secrets simply by holding knowledge of those secrets in their head while working for a direct competitor. The remedy for threatened misappropriation under this theory is to enjoin the former employee from working for the competitor. *See Payment All. Int'l, Inc. v. Ferreira*, 530 F. Supp. 2d 477, 482-83 (S.D.N.Y 2007) (enjoining a former employee from working for a competitor under the inevitable disclosure doctrine based on his knowledge of former employer's customers and marketing strategy because "he may unintentionally transmit information gain through his association with [his former employer]").

        i.     *Application of the Inevitable Disclosure Doctrine to the DTSA and OUTSA*

The inevitable disclosure doctrine constitutes a narrow avenue for courts to provide injunctive relief for threatened misappropriation of trade secrets. The doctrine requires a court to recognize and enforce a de facto noncompetition agreement to which the former employee is bound, even where no express agreement exists. *See Bayer Corp. v. Roche Molecular Sys., Inc.*, 72 F. Supp. 2d 1111, 1120 (N.D. Cal. 1999) ("To the extent that the theory of inevitable disclosure creates a de facto covenant not to compete without a nontrivial showing of actual or threatened use or disclosure, it is inconsistent with California law."). Pursuant to federal law, the DTSA specifically forecloses courts from granting relief based on the inevitable disclosure

doctrine *because* such relief restrains employment. Under the DTSA, "a court may grant an injunction to prevent any actual or threatened misappropriation . . . *provided the order does not prevent a person from entering into an employment relationship*[.]" 18 U.S.C. § 1836(b)(3)(A)(i)(I) (emphasis added). Based on the plain language of the statute, the DTSA provides no avenue for the Court to grant Plaintiff its requested relief.

Several states recognize the inevitable disclosure doctrine under their respective trade secret misappropriation statutes. *See Phoseon Tech.*, 2019 WL 7282497, at *11 ("Seventeen states appear to have adopted the inevitable disclosure doctrine in one form or another.").[3] Oregon is not one of those states. In *Phoseon*, this Court declined to decide whether the plaintiff's claim of threatened misappropriation based on the inevitable discovery doctrine was likely to succeed. *Id.* The former employee in that case was subject to a noncompetition agreement, and the Court granted injunctive relief on that basis alone. *Id.* But, in dictum, the Court noted that it was unlikely that Oregon would adopt the inevitable disclosure doctrine because of the state legislature's recent trend of allowing greater freedom of employment. *Id.* ("If one evaluates the likelihood of the Oregon Supreme Court adopting the inevitable disclosure doctrine by considering the history of legislation over the years, the result does not yield confidence that the doctrine will be adopted in Oregon anytime soon.").

The Oregon legislature limited the enforceability of noncompetition agreements in 2007 and has evinced a clear concern for the rights of its employees. 2007 Or. Laws 2765. Among other limitations, current Oregon law makes noncompetition agreements voidable unless the

---

[3] California, Colorado, Louisiana, Maryland, and Virginia have specifically rejected the doctrine. *Phoseon Tech.*, 2019 WL 7282497, at *11; *see, e.g.*, *Bayer Corp.*, 72 F. Supp. 2d at 1120. ("California trade secrets law does not recognize the theory of inevitable disclosure; indeed, such a rule would run counter to the strong public policy in California favoring employee mobility.").

employer informed the employee in writing at least two weeks before the start of employment that a noncompetition is required as a condition of employment. O.R.S. 653.295(1)(a)(A). Oregon employment law does not explicitly prohibit protecting trade secrets through injunctive relief that restricts employment. *See* O.R.S. 653.295(5) ("Nothing in this section restricts the right of any person to protect trade secrets or other proprietary information by injunction or any other lawful means under other applicable laws."). But because Oregon limits and makes voidable even express noncompetition agreements, the Court finds that Oregon courts would be unlikely to interpret the OUTSA as providing an avenue for de facto, post-hoc noncompetition agreements as would be required by the inevitable disclosure doctrine. *See IKON Off. Sols., Inc. v. Am. Off. Prods., Inc.*, 178 F. Supp. 2d 1154, 1168 (D. Or. 2001) (rejecting a plaintiff's trade secrets claim in part because granting relief would amount to "a long-term non-competition requirement, but without any of the restrictions that the Oregon legislature has imposed upon non-competition agreements"). Because Oregon law favors employee mobility, the Court declines to adopt the inevitable disclosure doctrine or apply it to this case.

    ii.  *Plaintiff's Claims under the Inevitable Disclosure Doctrine*

Even if the Court were to recognize the inevitable disclosure doctrine, Plaintiff cannot show a likelihood of success on the merits based on this theory. Under the inevitable disclosure doctrine, Plaintiff must show that Smith would need to use or disclose his knowledge of Kinship's trade secrets to perform his job at Embark. *See Amazon.com, Inc. v. Powers*, No. C12-1911RAJ, 2012 WL 6726538, at *7 (W.D. Wash. Dec. 27, 2012) ("Evidence of what [the former employee] knows is not enough; [plaintiff] must show that [the former employee] is likely to disclose it."). In addition, a plaintiff must show that a former employee takes to the competitor

more than just general knowledge and skills acquired during their employment. *PepsiCo*, 54 F.3d at 1269.

"The crux of an inevitable disclosure argument in this context is a showing that an employee's new job so closely resembles her old one that it would be impossible to work in that job without disclosing confidential information." *Amazon.com,* 2012 WL 6726538, at *7; *see Lam Rsch. Corp. v. Deshmukh*, No. C04-5435FDB, 2005 WL 8173156 , at *5 (W.D. Wash. Jan. 3, 2005) (holding that a plaintiff could only proceed on an inevitable discovery claim by showing it was impossible for the defendant in his new role "to make management decisions without benefitting from the intimate knowledge of [plaintiff's] trade secrets, business plans, and strategies to which [d]efendant was privy"). To show that disclosure is inevitable, a plaintiff must "make a detailed showing of a similarity between an employee's new job and old job." *Amazon.com,* 2012 WL 6726538, at *7.

Plaintiff alleges, but cannot demonstrate, that Smith's role at Embark is substantially similar to his prior role at Kinship. Smith testified that he only became interested in Embark's offer to discuss employment when he learned that Embark was planning to move in a different direction, which would provide him the opportunity to work in a different role. Emily Levada, Chief Product Officer and Smith's new direct supervisor at Embark, testified that Smith will work in a section of Embark that focuses on new product discovery and early development. He was not hired to work in the section of Embark that competes with Kinship in marketing and selling dog DNA products. While Smith admits that his new job will involve some product development, his focus will be on research and discovery. Embark's onboarding document for Smith describes a role focused more on scientific research and discovery than on marketing and

business strategy.[4] Thus, Plaintiff cannot meet its burden of showing that Smith will work in a substantially similar role at Embark as his prior position at Kinship.

Next, Plaintiff presents no facts that show Smith would necessarily disclose Kinship's trade secrets to fulfill his job duties at Embark. Nothing in Plaintiff's presented evidence suggests that Smith intends to disclose Kinship's trade secrets to his new employer. Smith acted with candor when he resigned from Kinship. *Cf. PepsiCo*, 54 F.3d at 1271 (finding that the defendant's lack of candor in pursuing and accepting a job with a competitor to be a factor in determining whether he would threaten misappropriation of the plaintiff's trade secrets). Smith's supervisor at Embark presented strategies she would employ to ensure that Smith does not work on projects that would require him to use his specific knowledge Kinship's trade secrets. The Court finds that such measures are sufficient to protect against inevitable disclosure. Thus, even if the Court were to apply the inevitable disclosure doctrine, Plaintiff cannot show that Smith's position at Embark would require him to disclose or use Kinship's trade secrets. Plaintiff's allegations of threatened disclosure are no more than speculation.

Because Plaintiff does not present sufficient facts demonstrating actual misappropriation and cannot rely on the inevitable disclosure doctrine for threatened misappropriation, it does not meet its burden of showing a substantial likelihood of success on the merits.

## II.   Irreparable Harm

Plaintiff alleges that it will be "substantially and irreparably harmed if Smith is allowed to join or continue working for Embark, as he will necessarily use and disclose Kinship's trade

---

[4] Embark's onboarding document for Smith states, "you will focus on supporting and improving the Research & Development arm of Embark (internally called "Branch 2")[.] . . . your work will *not* be focused on our existing product's strategy, sales or NPS. Success in your role will be measured on the rate and value of new discovery[.]" Ex. 42.

secrets in connection with his employment there." Pl. Mot. 25. Plaintiff is correct that "the misappropriation of trade secrets constitutes *prima facie* evidence of irreparable harm." *Phoseon Tech.*, 2019 WL 7282497, at *12. "A trade secret once lost is, of course, lost forever." *FMC Corp. v. Taiwan Tainan Giant Indus. Co., Ltd.*, 730 F.2d 61, 63. Injunctive relief is the appropriate remedy for the harm caused by trade secret misappropriation because the loss typically cannot be measured in money damages. *Id.*

But Plaintiff cannot show irreparable harm because there is no evidence that Smith acted in bad faith or has breached his Confidentiality Agreement with Kinship. Plaintiff presents no evidence that Smith inappropriately procured or retained any confidential or proprietary documents. Plaintiff claims that without an injunction preventing Smith from working for Embark, "Smith's decisions will inevitably be informed by his detailed knowledge of Kinship's strategic plans for gaining a competitive advantage against Embark." Pl. Mot. 26. Thus, in alleging irreparable harm, Plaintiff relies on the inevitable disclosure doctrine—a legal theory that is unavailable. As the Court cannot grant relief based on the inevitable disclosure doctrine, Plaintiff does not meet its burden of showing it will suffer irreparable harm if a preliminary injunction is not granted.

### III. Balance of the Equities

In evaluating whether to grant a preliminary injunction, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the request relief." *Winter*, 555 U.S. at 24. For a court to grant injunctive relief, "the injunction must do more good than harm (which is to say the balance of equities favors the plaintiff)." *Alliance for the Wild Rockies*, 632 F.3d at 1133 (quoting *Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009). Under the Ninth

Circuit's "serious questions" test, a weak showing of likelihood of success may be enough to justify a preliminary injunction if serious questions going to the merits were raised. *Id.* But in that situation, the plaintiff must show that "the balance of hardships tips sharply in the plaintiff's favor." *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc) (internal quotation and citation omitted).

Here, Plaintiff seeks to enjoin Smith from working for Embark for a period of 12 months. Plaintiff has a strong interest in protecting its trade secrets. But Plaintiff cannot show its trade secrets are under threat of misappropriation because it relies on a legal theory that is unavailable in Oregon. Defendants, on the other hand, have an interest in the free flow of commerce and of employment. A preliminary injunction would restrain Smith's freedom to be employed where he chooses. Given Oregon's proclivity to protect the rights of workers to choose where they are employed, and the Court's reluctance to create a de facto noncompetition agreement where none exists, the Court finds the balance of equities favors Defendants and weighs against a preliminary injunction.

## IV.     Public Interest

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). "When the reach of an injunction is narrow, limited only to the parties, and has no impact on non-parties, the public interest will be at most a neutral factor in the preliminary injunction analysis." *Stormans v. Selecky*, 586 F.3d 1109, 1138-39 (9th Cir. 2009).

Plaintiff asserts that the public interest factor weighs in its favor because, if Smith works for and discloses trade secrets to Embark, such action would have public consequences by

"unfairly stifl[ing] competition in an extremely limited market." Pl. Mot. 28. But Plaintiff provides little support for this claim. If Smith were to disclose Kinship's trade secrets in the course of his new employment, Embark could potentially gain an advantage over Kinship. But Plaintiff fails to show how that advantage would stifle competition in the industry as a whole. Thus, any potential anticompetitive impact of Defendants' alleged misappropriation is too speculative to be considered a factor in the public interest analysis.

In contrast, given the Oregon legislature's demonstrated intent to protect employee mobility, restricting employment through a preliminary injunction could undermine Oregon's public interest goals. Accordingly, the public interest factor is at best neutral, but may weigh slightly against granting a preliminary injunction.

## CONCLUSION

Because Plaintiff has not met its burden of persuasion as to the four *Winter* elements, the Court dissolves the Temporary Restraining Order [13] and DENIES Plaintiff's Motion for a Preliminary Injunction [2].

IT IS SO ORDERED.

DATED:  January 3, 2022  .

                                        *Marco Hernandez*
                                        MARCO A. HERNÁNDEZ
                                        United States District Judge